IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 13-11-2 |
| ) | |
| JAMES GRAY ) | |

## OPINION

DIAMOND, D.J.

On January 15, 2013, defendant James Gray and his co-defendant Tyrone Parker were charged in a one-count indictment with conspiracy to possess with intent to distribute and distribution of 500 grams or more of cocaine from on or about December 5, 2012 to on or about December 6, 2012, in violation of 21 U.S.C. §846. Defendant has filed the following pretrial motions: (1) Motion to Suppress Evidence and Statements (Document No. 53); and (2) Motion to Produce Evidence which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 (Document No. 52). The government has filed its Omnibus Response in Opposition to defendant's motions (Document No. 60), and defendant has filed a Reply thereto (Document No. 61). Hearings were held on these matters on December 5 and 9, 2013. After considering the evidence presented at the hearings and the arguments of counsel, defendant's Motion to Suppress will be denied, and his Motion Under Rules 404(b) and 609 will be granted in part and denied in part as explained below.

I. **Background**

At the hearings, the government presented testimony by FBI Agent Leonard Piccini, Jr., Pennsylvania State Police ("PSP") Corporal Todd Rudy and PSP Trooper Scott Fidler. Their testimony, and the exhibits received into evidence at the hearings, establish the facts summarized below.

In the fall of 2012, a confidential source ("CS") informed the FBI that Tyrone Parker had traveled from New York to Pittsburgh on three prior occasions to conduct drug transactions with the CS. The CS indicated that Parker previously had used "tail cars" to make the deliveries, meaning that Parker had utilized a courier who drove a second vehicle to actually transport the drugs. In recorded telephone calls, the CS and Parker negotiated a deal for two kilograms of cocaine. Parker planned to travel to Harrisburg, Pennsylvania on December 6, 2012, and then would contact the CS to determine an exact meeting location.

The FBI determined the best way to intercept the cocaine was to locate Parker on the highway and conduct a traffic stop of his vehicle, which the FBI learned was a 2011 black Honda. The FBI provided the information concerning Parker and his vehicle, including his past use of tail cars, to the PSP Interdiction Unit in Harrisburg.

The PSP set up a patrol area on a section of the Pennsylvania Turnpike on the afternoon of December 6, 2012, with a plan to conduct a traffic stop of Parker's vehicle. The FBI provided the PSP with data indicating the location of the cellular telephone associated with Parker. The first PSP trooper who spotted Parker's Honda vehicle noticed that a van appeared to be following Parker. This trooper observed the Honda and the van traveling in tandem for approximately 40 miles, meaning that when the Honda made a lane change, the van did so as well. The trooper

reported this information over a protected communication line to the other troopers involved in the operation.

Trooper Anthony Todaro eventually observed the Honda vehicle driven by Parker being followed too closely by a Ford Econoline van. Trooper Todaro conducted a traffic stop of the Honda, and the van continued westbound on the Turnpike. This information was relayed to Trooper Fidler.

Trooper Fidler drove westbound to conduct a traffic stop of the van for following the Honda too closely, but instead he discovered the van, with its emergency lights activated, stopped along the side of the highway. Trooper Fidler pulled up behind the van, and at that point defendant exited the vehicle. Trooper Fidler directed defendant back into his van, and he complied. The trooper approached the van and asked defendant why he was parked on the side of the road, and defendant responded that smoke was coming from his engine. Trooper Fidler looked at defendant's engine, but did not observe any smoke or other problems. The trooper asked defendant if he needed a tow truck, but defendant declined. Trooper Fidler then asked defendant for his license and registration. While defendant made those items available, Trooper Fidler observed cell phones on the center console of the van, and smelled a strong odor of air fresheners, which he testified are commonly used to cover the scent of narcotics.

In response to Trooper Fidler's question about his travel plans, defendant responded that he was traveling to Lancaster, Pennsylvania. However, at that point, defendant already had passed all Lancaster exits, but he claimed that he had become distracted while talking to his wife on the phone. Trooper Fidler then informed defendant of the traffic violation of following the other vehicle too closely, but defendant claimed he did not recall committing any such violation.

3

Trooper Fidler returned to his vehicle to run a check of defendant's license and learned that defendant had several prior narcotics convictions in Pennsylvania and New York. As Trooper Fidler was checking defendant's license, defendant again exited the van, approached the trooper's vehicle and asked where he was on the Turnpike. Trooper Fidler directed defendant back to his van.

Trooper Fidler returned to defendant's van, returned his license, gave him a verbal warning for following another vehicle too closely and told him he was free to leave. Trooper Fidler took a few steps back from the van and then asked defendant if he could ask him some additional questions, and defendant agreed.

Trooper Fidler explained to defendant the purpose of interdiction on the highway, which is that troopers look for criminals and contraband. Trooper Fidler then asked defendant if he had any marijuana, heroin or large sums of money, which he denied. When Trooper Fidler asked defendant if he had cocaine, defendant hesitated, looked away and said no. According to Trooper Fidler, defendant's demeanor and response to the inquiry about cocaine raised his suspicion because he had not reacted that way regarding any of the other narcotics.

Trooper Fidler asked defendant if he had any prior arrests. Defendant responded that he had been arrested for some minor drug violations and domestic matters. Trooper Fidler again asked if defendant would like a tow truck, but defendant declined. In response to Trooper Fidler's question about whether defendant still planned to travel to Lancaster, defendant said that he was just going to pull off the Turnpike at the next exit and wait, which struck Trooper Fidler as odd.

By this time, Corporal Housel and K-9 Nemo, a narcotics detection dog, had arrived at the scene. Trooper Fidler asked if he could search defendant's van and subject it to a canine scan, and

AO 72
(Rev. 8/82)

defendant agreed to a search. Trooper Fidler asked defendant to exit the van and meet him in front of the vehicle to sign a consent to search form. At this point, Trooper Fidler observed defendant lean over and reach toward the passenger side floorboard. Trooper Fidler testified that he then jumped on the side of the van to prevent defendant from accessing a weapon. As Trooper Fidler did so, defendant pulled the van into a lane of traffic on the Turnpike, with the trooper clinging to the side of the van.

Trooper Fidler testified that he drew his firearm, pointed it at defendant and ordered him to stop the van. Defendant stopped in the lane of Turnpike traffic and then pulled onto the side of the road. Trooper Fidler placed defendant under arrest for aggravated assault and reckless endangerment and gave him a Miranda warning.

After the incident, defendant apologized and made statements indicating that he had been hired earlier that day to drive to Scranton to pick up the family of a man named "J." Defendant also purportedly followed another car to the area, but could not explain why he had done so or why he was nowhere near Scranton. Defendant also admitted that he initially lied to the trooper and was not driving to Lancaster. Defendant indicated that he became scared when he felt the search was going to occur.

Defendant was transported to the PSP barracks in Harrisburg for processing, and he was given another Miranda warning. When defendant was interviewed, he admitted that he was traveling with another vehicle.

Back at the scene of the highway stop, K-9 Nemo scanned the exterior of defendant's van and alerted to the presence of controlled substances. Based on the positive scan, the troopers had the van towed to the PSP barracks in Harrisburg. On December 7, 2012, Trooper Fidler obtained

5

a search warrant for defendant's van. Upon executing the warrant, the troopers seized two kilograms of cocaine, cash and several cellular telephones.

## II. Motion to Suppress Evidence and Statements (Document No. 53)

Defendant argues that the evidence seized and statements obtained from him as a result of his arrest on December 6, 2012, should be suppressed because the evidence was seized and the statements were obtained in violation of the Fourth Amendment. Defendant asserts that the PSP troopers who seized and arrested him lacked probable cause to do so. Defendant claims that even if the seizure was a Terry seizure, it violated the Fourth Amendment because the troopers lacked reasonable suspicion. In addition, defendant contends that any statements he made at the scene of his arrest and subsequently at the PSP barracks must be suppressed as fruit of the prior unlawful seizure and arrest.

The government counters that given the totality of the circumstances, when defendant fled from the side of the road, Trooper Fidler had at least reasonable suspicion to believe he was involved in drug trafficking, if not probable cause to arrest him for drug trafficking. Because defendant's detention and arrest were proper, the government submits that defendant's subsequent statements and evidence seized from his van following execution of the search warrant are admissible.

For reasons explained below, the court finds that during Trooper Fidler's roadside encounter with defendant, he had reasonable suspicion to detain defendant for drug trafficking, which ripened into probable cause to arrest defendant when he fled from the side of the road. Accordingly, because the detention and arrest of defendant were proper, his subsequent statements and evidence

AO 72
(Rev. 8/82)

seized from his van are admissible.

> **A.  The trooper initially had reasonable suspicion to detain defendant for drug trafficking, which was elevated to probable cause to arrest him when he fled from the side of the road.**

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citing Terry, 392 U.S. at 30). Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. Sokolow, 490 U.S. at 7. Although reasonable suspicion requires more than a hunch, the law enforcement agent need not be absolutely certain that a crime has been committed. Rather, "the issue is whether a reasonably prudent man in the circumstances would be warranted in his belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. To determine whether reasonable suspicion exists, we must consider the totality of the circumstances. Sokolow, 490 U.S. at 8.

In order for a warrantless arrest to be lawful, it must be based on probable cause. United States v. Watson, 423 U.S. 411, 423-24 (1976). In Watson, the Supreme Court held that probable cause for a warrantless arrest exists when the officer has reasonable grounds to believe that an offense has been or is being committed. Id. at 417-18; see also Beck v. Ohio, 379 U.S. 89, 91 (1964) (probable cause exists whenever circumstances within a police officer's knowledge are sufficient to warrant a prudent person to believe that an offense has been committed by the person being arrested).

Considering the totality of the circumstances, Trooper Fidler's roadside encounter with

7

defendant gave him reasonable suspicion to detain defendant for drug trafficking. The FBI and PSP had received information from a CS that co-defendant Tyrone Parker would be traveling through Harrisburg to make a delivery of cocaine on the date of the incident. According to the CS, Parker previously used "tail cars" when making such deliveries, meaning that he used a second vehicle to actually transport the drugs.

Initially, a PSP trooper observed Parker's Honda vehicle and a van traveling in tandem on the Turnpike for approximately 40 miles. The trooper relayed that information over a protected communication line, and eventually Trooper Todaro observed Parker's Honda being followed too closely by a van. Trooper Todaro conducted a traffic stop of Parker's vehicle, and Trooper Fidler subsequently encountered the van driven by defendant stopped on the side of the road.

During the roadside encounter, Trooper Fidler's suspicion was raised by the inconsistent information defendant provided. Defendant indicated that he stopped because he had smoke coming from his engine, yet Trooper Fidler could detect no such problem. Defendant also provided Trooper Fidler with inconsistent travel information, claiming he was traveling to Lancaster, Pennsylvania after already having passed all exits for Lancaster. In addition, Trooper Fidler observed cell phones in the van and smelled a strong odor of air fresheners, which he testified are commonly used to cover the scent of narcotics. Further, when Trooper Fidler ran a check of defendant's license, he learned that defendant had several prior narcotics convictions.

After Trooper Fidler gave defendant a warning for following another vehicle too closely, he told defendant he was free to leave, but then asked defendant if he would answer a few more

AO 72
(Rev. 8/82)

questions and defendant agreed.[1] When asked if he was still planned to travel to Lancaster, defendant indicated he was just going to pull off the Turnpike at the next exit and wait, which made no sense since defendant purportedly was traveling alone. Trooper Fidler's suspicions were further heightened when he asked defendant whether he was transporting a number of controlled substances, including cocaine, and defendant's demeanor changed only in response to the cocaine inquiry.

Trooper Fidler asked defendant if he would agree to a search of his van and a canine scan, and defendant responded that he would agree. Trooper Fidler then asked defendant to exit the van to sign a consent to search form. Despite having agreed to a search, defendant did not exit the van, but rather leaned over the passenger floorboard, which concerned Trooper Fidler that defendant was attempting to access a weapon. Defendant then pulled away from the side of the road into Turnpike traffic with Trooper Fidler clinging to the side of the van.

In sum, Trooper Fidler initially had reasonable suspicion to detain defendant for drug trafficking based on the following: (1) law enforcement had received information from the CS about co-defendant Tyrone Parker and his drug trafficking activities; (2) defendant was traveling on the Turnpike in tandem with Parker who had agreed to transport cocaine on the day of the incident; (3) defendant provided Trooper Fidler with untruthful and/or inconsistent information about his purported engine problems and travel plans; (4) Trooper Fidler observed defendant's demeanor change in response to the trooper's question whether he was transporting cocaine; (5) Trooper

---

[1] Trooper Fidler was justified in extending the encounter based on the conflicting information he received from defendant. See United States v. Givan, 320 F.3d 452, 458-59 (3d Cir. 2003) (finding that a state trooper was justified in further extending a traffic stop and asking for consent to search the vehicle, after previously having indicated that the driver was free to go, when the trooper received conflicting stories from the driver and passengers regarding their travel plans).

AO 72
(Rev. 8/82)

Fidler learned that defendant had prior drug convictions, but defendant indicated that he only had been arrested for some minor drug violations and domestic matters; and (6) despite agreeing to a search of his van, defendant fled from the side of the road into Turnpike traffic with Trooper Fidler clinging to the side of his van. See e.g., United States v. Bonner, 363 F.3d 213, 217 (3d Cir. 2004) ("... flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion").

Considering the totality of the circumstances, these factors initially provided Trooper Fidler with reasonable suspicion to detain defendant for drug trafficking. The reasonable suspicion subsequently was elevated to probable cause to seize and arrest because defendant consented to a search of his van, yet instead of exiting the van as he agreed, he fled from the side of the road into Turnpike traffic.[2] Defendant's flight, coupled with the other factors known to, and observed by, Trooper Fidler as summarized above, provided probable cause for Trooper Fidler to believe that defendant was engaged in drug trafficking. See e.g., United States v. Laville, 480 F.3d 187, 195 (3d Cir. 2007) (deliberate flight generally elevates reasonable suspicion to probable cause if the police have reasonably trustworthy information to believe that an individual is engaged in criminal activity).

---

[2]Defendant argues that he was permitted to revoke his consent at any time, and his conduct in departing the scene instead of exiting the van indicates his refusal to consent or revocation of his consent to search. "A consent that waives Fourth Amendment rights may be limited in scope and may be withdrawn by an unequivocal act or statement that clearly expresses the individual's desire not to be searched." United States v. Wilmore, 57 Fed. Appx. 949, 953 (3d Cir. 2003) (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)). In Wilmore, the Third Circuit found that the defendant's two steps backward after the police officer stated his intent to pat him down and began reaching toward him was not an unequivocal withdrawal of consent. Rather, the defendant's movement was determined to be ambiguous and reasonably could have been construed as taking flight rather than withdrawing consent. Wilmore, 57 Fed. Appx. at 953. Here, the court construes defendant's action in driving his van from the side of the road into Turnpike traffic as taking flight, not revocation of consent as he contends.

AO 72
(Rev. 8/82)

Because the troopers had at least reasonable suspicion to detain defendant, they could lawfully conduct a canine scan of the exterior of his van. See United States v. Pierce, 622 F.3d 209, 213 (3d Cir. 2010). After the positive canine scan, the troopers could properly detain defendant while they obtained a search warrant, which is what occurred. See United States v. Massac, 867 F.2d 174, 176 (3d Cir. 1989) ("When the alert was given by the dog, we are satisfied that, at least when combined with the other known circumstances, probable cause existed to arrest.").

### B. Defendant's statements and the evidence obtained from his van following execution of the search warrant are admissible.

Defendant also argues that the statements he made at the scene of his arrest and subsequently at the PSP barracks, as well as the cocaine and other items seized from his van following execution of the search warrant, must be suppressed as the fruit of the prior unlawful seizure and arrest. See Wong Sun v. United States, 371 U.S. 471, 488 (1963) (holding that evidence obtained as a direct result of an unconstitutional search or seizure is subject to exclusion). As we have held that the detention and arrest of defendant were proper, his subsequent statements and evidence seized from his van following execution of the search warrant are admissible.

### III. Motion to Produce Evidence Which the Government Intends to Use Under Federal Rules of Evidence 404(b) and 609 (Document No. 52)

Defendant seeks an order compelling the government to provide him with a statement of the nature, dates and places of occurrences of any criminal offenses or acts of misconduct other than those set forth in the indictment which the government will attempt to prove at trial pursuant to Fed.R.Evid. 404(b) and/or evidence of any prior convictions pursuant to Rule 609. Defendant also requests a pretrial hearing to determine the admissibility of any evidence the government intends

11

AO 72
(Rev. 8/82)

to offer under Rule 404(b).

Rule 404(b) requires the government to provide reasonable notice prior to trial of its intention to use evidence of other crimes, wrongs or acts for the purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident. See Fed.R.Evid. 404(b)(2). According to the Rule, "[o]n request by a defendant in a criminal case, the prosecutor must: (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and (B) do so before trial . . . ." Fed.R.Evid. 404(b)(2)(A) and (B).

The government's response indicates that it has not yet identified the specific bad acts by defendant that it will seek to introduce at trial. The government states it is aware of the notice requirement under Rule 404(b), and it will provide the required notice at least two weeks before trial. Defendant argues in his Reply that the government has not offered any compelling reason for refusing to disclose Rule 404(b) evidence forthwith. Defendant contends that notice two weeks before trial will prejudice him because his counsel will not have adequate time to investigate the government's allegations and prepare his defense, especially in light of the of the limited resources of the Federal Public Defender's Office.

According to the commentary to Rule 404(b), other than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes reasonable notice will depend on the circumstances of each case. Courts that have considered what constitutes "reasonable notice" have concluded that notice of intent to use Rule 404(b) evidence seven to ten days prior to trial is sufficient. See United States v. Evangelista, 813 F.Supp. 294, 302 (D.N.J. 1993) (ten days); United States v. Alex, 791 F.Supp. 723, 728-29 (N.D.Ill. 1992) (seven days); United States v. Williams,

792 F.Supp. 1120, 1133 (S.D.Ind. 1992) (ten days). Thus, the government's commitment to provide notice under Rule 404(b) at least two weeks prior to trial is consistent with the case law interpreting the rule, and an order will be entered to that effect.

Defendant's request for a pretrial hearing on the admissibility of Rule 404(b) evidence will be denied. It is preferable to resolve Rule 404(b) objections in conjunction with the factual context of the case. See United States v. Giampa, 904 F.Supp. 235, 284 (D.N.J. 1995) ("Generally, objections as to the admissibility of prior bad acts under Rule 404(b) are properly asserted during trial, not at the pretrial stage.").

As for defendant's request under Rule 609, the government indicates that it has provided him with a copy of his criminal record, which it will us as impeachment material if defendant testifies at trial.[3] Accordingly, defendant's Rule 609 request will be denied as moot.

---

[3] Rule 609(a)(1)(B) allows, for the purpose of attacking the credibility of an accused, the admission of evidence that the accused has been convicted of any crime punishable by death or imprisonment in excess of one year if the court determines that the probative value of admitting that evidence outweighs the prejudicial effect to the accused. Rule 609(a)(2) further provides that evidence that any witness has been convicted of a crime involving dishonesty or false statement shall be admitted regardless of punishment. The only notice requirement in Rule 609 is that the government is required to provide "reasonable written notice" of its intent to use evidence of a conviction more than ten years old. Fed.R.Evid. 609(b)(2).

13

## IV. Conclusion

For the foregoing reasons, defendant's Motion to Suppress Evidence and Statements will be denied, and his Motion under Federal Rules of Evidence 404(b) and 609 will be granted in part and denied in part as explained herein. An appropriate order will follow.

_Gustave Diamond_
Gustave Diamond
United States District Judge

Date: February 10, 2014

cc: Eric Rosen
Assistant U.S. Attorney

Marketa Sims
Assistant Federal Public Defender

AO 72
(Rev. 8/82)