

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

———————

No. 2:13-cr-11

———————

UNITED STATES OF AMERICA,

v.

JAMES GRAY,

                              Defendant.

———————

**MEMORANDUM OPINION**

———————

**J. Nicholas Ranjan, United States District Judge**

      In 2013, Defendant James Gray pled guilty to conspiring to distribute cocaine and was sentenced to serve 12 years in prison. Now, like thousands of other prisoners across the country, he seeks immediate compassionate release based on the threat of the COVID-19 pandemic that "has paralyzed the entire world." *United States v. Rodriguez*, — F. Supp. 3d —, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020).

      This Court has discussed the standard for granting such motions in *United States v. Somerville*, — F. Supp. 3d —, 2020 WL 2781585, at *1 (W.D. Pa. May 29, 2020). Under that standard, a medically compromised prisoner's showing of non-speculative risk of exposure to COVID-19 can justify compassionate release, unless the section 3553(a) sentencing factors weigh significantly against that

outcome. After all, a prison sentence should "not include incurring a great and unforeseen risk of severe illness or death." *Rodriguez*, 2020 WL 1627331, at *12.

Here, however, Mr. Gray has not made a strong enough showing to justify the significant sentence reduction he seeks. In particular, the Court finds that Mr. Gray has not shown that he has a sufficiently serious medical condition, or that he faces a sufficiently non-speculative risk of exposure to COVID-19 in prison, to constitute an "extraordinary and compelling" reason for release. Additionally, and perhaps more importantly, the Court finds that the section 3553(a) factors do not justify Mr. Gray's release, given the significant time remaining on his sentence, his criminal history, the circumstances of his offense, and the nature of his original sentence—a stipulated sentence nearly a decade shorter than the low end of his advisory guideline range.

For these reasons, his motion is denied.

## BACKGROUND

Mr. Gray is serving a sentence of 144 months' imprisonment after pleading guilty to conspiring to distribute, and possessing with the intent to distribute, more than 500 grams of cocaine, in violation of 21 U.S.C. § 846. This term of imprisonment will be followed by an eight-year term of supervised release.

Having completed about 60% of his sentence, Mr. Gray now moves under 18 U.S.C. § 3582(c)(1)(A)(i) for a reduction of his prison sentence to time-served based on his underlying medical conditions and the risk of exposure to COVID-19 at FCI Danbury. The government opposes Mr. Gray's release.

Given the urgency of Mr. Gray's motion, and because the Court writes for the benefit of the parties, who are presumably familiar with the pertinent background facts, the Court will dispense with any comprehensive summary of those facts and only reference those facts necessary to its decision as they become relevant to the analysis below.

## DISCUSSION & ANALYSIS

A court usually "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). But there are "a few narrow exceptions" to this general "rule of finality." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One is the compassionate-release statute, 18 U.S.C. § 3582(c)(1)(A), which allows a court to "reduce" a term of imprisonment if it finds that (1) "extraordinary and compelling reasons" warrant reduction; (2) the reduction is "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) consideration of the ordinary sentencing factors under 18 U.S.C. § 3553(a) favors reduction.

Until last year, only the Bureau of Prisons ("BOP") could file motions for compassionate release, and it "rarely did so." *Rodriguez*, 2020 WL 1627331, at *2. Indeed, "[f]rom 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions." *Id.* (citation omitted). According to a report by the Department of Justice's Inspector General, these low numbers resulted from a combination of poor management, inconsistent implementation, a lack of clear standards, and the resultant "varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id.* (citation omitted).

Unsatisfied with the compassionate-release program, Congress acted. In late 2018, it passed the First Step Act—a "landmark piece of criminal-justice reform legislation that amended numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Id.* (cleaned up); *see also United States v. Brooks*, No. 07-20047, 2020 WL 2509107, at *4 (C.D. Ill. May 15, 2020) ("The First Step was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."). Of relevance here, section 603(b) of the First Step Act, which Congress titled "Increasing the Use and Transparency of Compassionate Release," amended section 3582(c)(1)(A) to allow prisoners to bring compassionate-release motions directly to court—so long as they first ask the BOP to file a motion on their behalf and then either exhaust the BOP's administrative appeal

process or wait 30 days, whichever comes first. *See* 18 U.S.C. § 3582(c)(1); First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018).

With this legislative backdrop, and amid an ongoing pandemic of unprecedented scale, the Court now confronts Mr. Gray's pending motion. For the following reasons, the Court finds that Mr. Gray's motion is properly before it but denies his request for release.

### I. Mr. Gray has satisfied the 30-day "fast-track" alternative to exhausting his administrative remedies.

Section 3582(c)(1)(A) permits a prisoner to bring a compassionate-release motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A). In other words, the prisoner "must at least ask the [BOP] to [file a compassionate-release motion] on their behalf and give BOP thirty days to respond." *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020) (citing 18 U.S.C. § 3582(c)(1)(A)). The Third Circuit has cautioned that strict compliance with this requirement "takes on added—and critical—importance" because of the "ongoing COVID-19 pandemic." *Raia*, 954 F.3d at 597.

Here, the government concedes that Mr. Gray satisfied the statutory requirements by requesting a reduction in sentence from the Warden of FCI Danbury more than 30 days before filing this motion. [ECF 135, pp. 4-5]. In fact, more than 30 days have elapsed even since the Warden responded to Mr. Gray's request. The Warden issued a written response denying that request on June 5, 2020, and Mr. Gray filed his motion on July 14, 2020.

The Court agrees that this is enough. As this Court held in *Somerville*, once 30 days have passed from the receipt of the request by the Warden, a defendant can seek relief in court. No more is required. *See Somerville*, 2020 WL 2781585, at *4. Section 3582, by its own terms, does not "require the moving defendant to fully litigate his claim

before the agency (*i.e.*, the BOP) before bringing his petition to court." *United States v. Haney*, — F. Supp. 3d —, 2020 WL 1821988, at *3 (S.D.N.Y. Apr. 13, 2020). Rather, the statute presents prisoners with two, alternative options: "*either* to exhaust administrative remedies *or* simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court." *Id.* (emphasis in original)

Recently, a split has developed across the country and even within this District as to the 30-day exhaustion requirement. Some courts, contrary to this Court's decision in *Somerville*, have held that a prisoner may seek judicial relief after "the lapse of 30 days from the receipt of such a request by the warden" **only if the warden hasn't responded**. In other words, they held that if, as here, the Warden issues a written denial within the 30-day period, the prisoner must proceed through a full appeal process within the BOP and exhaust that process before filing in court. *See, e.g., United States v. Grasha*, — F. Supp. 3d —, 2020 WL 4583874 (W.D. Pa. Aug. 10, 2020) (Conti, J.); *United States v. Nance*, No. 92-135, 2020 WL 114195 (W.D. Va. Jan. 10, 2020).

Recently, however, the Third Circuit resolved this split, and settled the issue. In *United States v. Harris*, the Third Circuit, in a precedential opinion, confirmed that the 30-day "fast track" option allows a prisoner to file suit 30 days after the Warden has received the prisoner's request, regardless of whether the Warden responds to that request or the prisoner exhausts all administrative appeals of the Warden's decision. *See United States v. Harris,* — F.3d —, 2020 WL 5198870, at *1 (3d Cir. July 20, 2020) ("We agree that the District Court erred . . . The Government argued, and the District Court agreed, that because the Warden denied Harris's request within thirty days, he was required to completely exhaust the administrative remedy process. However, the statute states that the defendant may file the motion thirty days after the warden receives his request.").

Thus, after *Harris*, it is settled law, at least in this Circuit, that a prisoner need only wait 30 days after submitting a request for release. *See United States v. Iezzi*, No. 17-157, 2020 WL 4726582, at *5 (W.D. Pa. Aug. 14, 2020) (Hornak, C.J.) (citing *Harris* and holding that

exhaustion is satisfied so long as "BOP received the request" and the prisoner "allowed the BOP at least 30 days to take the 'first crack' at resolving his request at the administrative level.").[1] Then, if the matter is not resolved to the prisoner's satisfaction within 30 days, he may seek court intervention. No more is required.

For these reasons, the Court finds that Mr. Gray has satisfied the 30-day "fast-track" alternative to administrative exhaustion.

## II. The Court may consider whether there are "extraordinary and compelling" reasons for release under the "catch-all" category of the Sentencing Commission's policy statement.

Next, the government argues that, in deciding whether "extraordinary and compelling" exist, the Court's authority is cabined by a policy statement issued by the Sentencing Commission before Congress enacted the First Step Act. That statement "lists three specific examples of extraordinary and compelling reasons," none of which

---

[1] An increasing number of courts from other jurisdictions have also joined the Third Circuit's view. *See, e.g.*, *United States v. Ezukanma*, No. 15-254, 2020 WL 4569067, at *4 (N.D. Tex. Aug. 7, 2020) ("[T]he plain language of § 3582(c)(1)(A) unambiguously supports the reading that 'lapse of 30 days' refers to the passage of thirty days from the warden's receipt of the request, irrespective of whether the warden denies the request."); *United States v. Brown*, — F. Supp. 3d —, 2020 WL 2091802, at *3 (S.D. Iowa Apr. 29, 2020) ("[T]he statute's plain text states only that thirty days must past after the defendant requests compassionate release from the warden. No more, no less.") (citation omitted); *United States v. Carter*, — F. Supp. 3d. —, 2020 WL 3458598, at *2 (S.D. W.Va. June 25, 2020) ("[T]he plain meaning of the text is that the 'lapse of 30 days' refers to the passage of 30 days."); *United States v. Woodson*, — F. Supp. 3d —, 2020 WL 1673253, at *2 (S.D.N.Y. Apr. 6, 2020) ("The plain language of the statute is free from ambiguity. … If the BOP does not act favorably on the defendant's request after 30 days, the exhaustion requirement is dispensed with[.]").

apply to Mr. Gray, and also "a fourth catch-all provision" that, on its face, applies only if the "Director of the Bureau of Prisons" determines "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." *Rodriguez*, 2020 WL 1627331, at *2 (cleaned up).

The government's position is that, while the First Step Act allowed courts to grant compassionate release "upon motion of the defendant" in addition to "upon motion of the Bureau of Prisons," it "did not change the substantive definition of 'extraordinary and compelling reasons.'" [ECF 135, p. 6]. By this, the government seems to mean that the Court is constrained by the enumerated reasons for compassionate release under subdivisions (A)-(C), and does not have the "catch-all" authority given to the "Director of the Bureau of Prisons" to find other "extraordinary and compelling" reasons for release.

The Court rejected that argument in *Somerville*, joining the "growing consensus of courts across the country" that have reached the same conclusion. *Somerville*, 2020 WL 2781585, at *6. That's because, while the government is correct that the First Step Act did not change the definition of "extraordinary and compelling reasons," the "catch-all" subdivision is part of that definition, while its limitation of the authority to make such determinations to the BOP Director, rather than the Court, is "part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance." *United States v. Redd*, 444 F. Supp. 3d 717, 725 (E.D. Va. 2020); *see also United States v. Young*, — F.Supp. 3d —, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (describing limitation of "catch-all" provision as "a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act.").

In other words, it is the limitation of catch-all authority to the BOP, not the definition of "extraordinary and compelling reasons" itself (which includes the "catch-all" category), that this Court and others have held is defunct after the First Step Act, and thus no longer an "applicable" policy statement. Given that, the most natural way to synthesize what remains of the Sentencing Commission's old policy statement with the amendments

made by the First Step Act is to say that the Court now "assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it." *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019).

For that reason, the Court finds that it has the authority to assess whether "there exists in [Mr. Gray's] case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13(1)(D).

### III. Mr. Gray has not shown "extraordinary and compelling reasons" to justify his release.

Turning to the crux of Mr. Gray's motion, the question becomes whether Mr. Gray has established "extraordinary and compelling" reasons for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Gray "bears the burden of proof of extraordinary and compelling circumstances[.]" *Durante v. United States*, No. 11-277, 2020 WL 2520280, at *2 n.3 (D.N.J. May 18, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)). But the Court is also mindful that he is proceeding *pro se* and will construe his filings liberally.

The proper analysis begins with the text of the statute, which does not "define—or place any limits on— what extraordinary and compelling reasons might warrant reduction." *Crowe v. United States*, 430 F. App'x 484, 485 (6th Cir. 2011) (cleaned up). The "catch-all" authority found in the Sentencing Commission's related policy statement, U.S.S.G. § 1B1.13(1)(D), is similarly open-ended about what constitutes an "extraordinary and compelling" reason. As a result, the Court gives the phrase its ordinary meaning. *See FCC v. AT & T Inc.*, 562 U.S. 397, 403 (2011).

The word "extraordinary" is commonly understood to mean "going beyond what is usual, regular, or customary," or "exceptional to a very marked extent." *Extraordinary*, Merriam-Webster Dictionary (2020); *see also Extraordinary*, Black's Law Dictionary (11th ed. 2019) ("Beyond what is usual, customary, regular, or common."). The word "compelling" means "forceful," "demanding

attention," or "convincing." *Compelling*, Merriam-Webster Dictionary (2020); *see also Compelling Need*, Black's Law Dictionary (11th ed. 2019) ("A need so great that irreparable harm or injustice would result if it is not met."). Thus, "at a minimum, [section] 3582(c)(1)(A)(i) requires a justification for release that is both **unusual** (*i.e.*, unique to the inmate, and beyond the ordinary hardship of prison) and **significant** (*i.e.*, serious enough to make release appropriate)." *Somerville*, 2020 WL 2781585, at *7 (emphasis in original).

In *Somerville*, this Court surveyed compassionate-release decisions related to COVID-19 from across the country, and inferred from those cases that, to establish an "extraordinary and compelling" reason in this context, a prisoner "must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held." *Id.* at *8. This test aligns with the Third Circuit's recent observation that the mere "existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner[.]" *United States v. Roeder*, 807 Fed. Appx. 157, 161 n.16 (3d Cir. 2020).

Applying that standard here, Mr. Gray's motion falls short. Mr. Gray asserts, and the government concedes, that he has hypertension. Mr. Gray also asserts, and the Court accepts, that he is obese and was told by a doctor that he is pre-diabetic.

On the record before it, the Court cannot categorically say, as the government seems to urge, that hypertension cannot be an "extraordinary and compelling" reason for release in the context of the COVID-19 pandemic. If a prisoner's hypertension is sufficiently serious, and the risk of exposure to COVID-19 in a given prison is particularly significant, it may well be enough. But hypertension is also undoubtedly a common condition that is not always very serious. Indeed, hypertension "affects about 46% of the U.S. adult population[.]" *United*

*States v. Colbert*, No. 99-80399, 2020 WL 3529533, at *2 (E.D. Mich. June 30, 2020).

Notably, most (though not all) COVID-19 release cases where hypertension has been considered a significant risk factor involve a defendant with pulmonary hypertension, or hypertension in connection with other cardiovascular, pulmonary, respiratory, or immunological conditions. *See, e.g.*, *Somerville*, 2020 WL 2781585, at *1 (obesity, hypertension, hyperlipidemia, chronic bronchitis, and asthma); *Rodriguez*, 2020 WL 1627331, at *7 (Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease."); *United States v. Pabon*, — F. Supp. 3d —, 2020 WL 2112265, at *1 (E.D. Pa. May 4, 2020) (diabetes, hypertension, hemophilia, atopic dermatitis, gastroesophageal reflux disease, peptic ulcer, and diverticulitis); *United States v. Muniz*, — F. Supp. 3d —, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020) (end stage renal disease, diabetes, and arterial hypertension).

CDC guidelines also notably distinguish between "pulmonary hypertension" (high blood pressure in the lungs), which the CDC says unequivocally "increases [the] risk of severe illness from COVID-19," and ordinary "hypertension (high blood pressure)," which the CDC says only "***may*** increase [the] risk of severe illness from COVID-19." *See* Centers for Disease Control, *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Sept. 1, 2020) (emphasis added).

Here, Mr. Gray's hypertension appears to be controlled with medication, and it is not comorbid with any other medical diagnosis (except that he may be pre-diabetic). But even assuming Mr. Gray's hypertension and obesity place him at *some* heightened risk of illness due to COVID-19 (as they likely do), he has not shown a sufficiently "non-speculative risk of exposure to COVID-19 in the facility where [he] is held." *Somerville*, 2020 WL 2781585, at *8; *see Brooks*, 2020 WL 2509107, at *5 ("This Court has previously stated the mere presence of COVID-19 in a particular prison cannot justify compassionate

release—if it could, every inmate in that prison could obtain release.") (cleaned up).

True, the prison where Mr. Gray is being held is the same prison this Court previously described as a "hotbed of COVID-19" in the federal prison system. *Somerville*, 2020 WL 2781585, at *9. But in the time since, the urgency of the situation at FCI Danbury appears to have lessened considerably. *See United States v. Rasberry*, 2020 WL 3977614, at *2 (D. Me. July 14, 2020) ("It appears that the situation at FCI Danbury has improved in the past two months."). In fact, as of September 2, 2020, BOP reports 0 active cases among inmates and only 1 active case among staff at FCI Danbury. *See* Federal Bureau of Prisons, *COVID-19 Coronavirus, available at* https://www.bop.gov/coronavirus/ (last accessed Sept. 2, 2020).

Even assuming a degree of undercounting, this is a vastly different situation than that presented several months ago in *Somerville*. There, the defendant (who had a longer list of high-risk medical conditions than Mr. Gray) was housed in a satellite camp at Danbury experiencing dozens of active infections. *See Somerville,* 2020 WL 2781585, at *10. Additionally, the defendant in *Somerville* had shown an actual instance of direct exposure—a fellow prisoner with the virus who began vomiting in the middle of Mr. Somerville's unit—followed by an irregular quarantine in a prison kitchen and no apparent testing. *Id.* Here, while Mr. Gray describes some direct exposure between March and May (to four prisoners in his unit who later tested positive), he concedes that he was subsequently tested, tested negative, and quarantined. [ECF 132, p. 7].

Thus, even though he once had some degree of exposure at a time when the spread of COVID-19 at FCI Danbury was much greater, there is nothing to suggest that the risk of exposure persists or is likely to be repeated. Nor does the exposure scenario Mr. Gray describes cause the Court concern about the medical care he is being provided—it sounds as if the prison handled the incident appropriately.

Another distinction between this case and *Somerville* is the Warden's response to Mr. Gray's request

for release. The Warden in *Somerville* summarily denied the defendant's petition without apparent consideration of his medical conditions or other personal circumstances. *See id.* ("The one-page denial letter sent to Mr. Somerville makes no mention of his medical conditions and instead appears to apply the outdated and restrictive standard that Congress sought to change with the First Step Act[.]"). Here, the Warden was somewhat more circumspect. The Warden's denial letter reflects that she considered Mr. Gray's specific medical condition (hypertension), and how well it was being managed at FCI Danbury, by reviewing his medical records. [ECF 132-1, p. 1]. The denial letter also reflects that the Warden considered the possibility of releasing Mr. Gray to home confinement, but determined that he was ineligible due to a "medium risk of recidivism." [*Id.* at p. 2]. While hardly conclusive, the fact that the BOP did the work of considering Mr. Gray's individualized circumstances here gives the Court more confidence in ultimately deferring to its judgment.

Finally, Mr. Gray may have another, more appropriate avenue to seek relief. According to Mr. Gray, he has been notified that he is among the subclass of inmates at FCI Danbury who may obtain some relief through an ongoing habeas class action against the prison. [ECF 132, p. 5]. The district court overseeing that case recently certified a settlement class, with objections to a proposed settlement due today, September 4, 2020. *See Whitted v. Easter*, No. 20-569, 2020 WL 4605224, at \*7 (D. Conn. Aug. 11, 2020). It appears that Mr. Gray falls into the group of "List One Inmates" who, if the settlement is approved, will be re-reviewed for eligibility for home confinement under the standards set by the district court's temporary restraining order and the settlement agreement. *See* Settlement Agreement, at Ex. A, *available at* http://www.danburylawsuit.com/agreement.pdf. [2] While

---

[2] An exhibit to the settlement agreement identifying "List One Inmates" lists an inmate with the initials "JG" and the first three digits of a BOP register number that matches the first three digits of Mr. Gray's register number. This is likely Mr. Gray. In any event, as noted, the Court's decision here does not depend on Mr. Gray obtaining relief through the settlement.

the Court's decision here does not depend on Mr. Gray obtaining relief through that lawsuit, another review of his case under those standards would assuage any remaining concern about the adequacy of the Warden's review process.[3]

For these reasons, the Court finds that Mr. Gray has not shown a sufficiently serious medical condition or uncontrolled exposure risk in the prison where he is held. Thus, he has not established an "extraordinary and compelling" reason to release him under section 3582(c)(1)(A).

### IV. Reducing Mr. Gray's sentence would conflict with the section 3553(a) considerations.

Even assuming Mr. Gray has shown "extraordinary and compelling reasons" for a sentence reduction, that is not the end of it. The Court must also weigh those extraordinary reasons against the ordinary sentencing factors under 18 U.S.C. § 3553(a) "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1). If the section 3553(a) factors weigh strongly against release, that can overcome otherwise "extraordinary and compelling reasons." *See United States v. Jones*, No. 12-38, 2020 WL 3871084, at *4 (W.D. Pa. July 8, 2020) (Ambrose, J.) ("[I]n considering the section 3553(a) factors, the Court should assess whether those factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence.") (cleaned up).[4]

---

[3] Nothing in this opinion should be construed as holding or suggesting that Mr. Gray should be ineligible for release or some other sentence modification (*e.g.*, home confinement or temporary release) if the BOP determines, based on its expertise, that such modification is appropriate after any reevaluation of Mr. Gray consistent with the settlement agreement in *Whitted*.

[4] The section 3553(a) factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the

Weighing the section 3553(a) factors here, the Court finds that a reduction in sentence is not appropriate. The 144-month sentence Mr. Gray received under his plea agreement was almost a decade shorter than the low end of his advisory guideline range, which was 262 months (or almost 22 years). [ECF 112, p. 13]. What's more, Mr. Gray has served only about 60% of the reduced sentence he bargained for, and thus has only just reached the high end of what his guideline range would have been if he were not designated a career offender.

Of course, Mr. Gray *was* designated a career offender. And unlike the defendant in *Somerville*, his criminal-history score does not appear to have been significantly "overstated." *Somerville*, 2020 WL 2781585, at *1. Instead, his criminal-history points were mainly earned through two serious, state-court convictions for possessing cocaine with the intent to distribute it—essentially the same crime he was convicted of here.

The nature and circumstances of Mr. Gray's current offense are also not mitigating. After being stopped, he drove into highway traffic with a state trooper clinging to the side of his van. *See United States v. Gray*, No. 13-11, 2014 WL 546757, at *3 (W.D. Pa. Feb. 10, 2014) (Diamond, J.). Furthermore, based on his use of a "tail car," the drug

---

sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. *See United States v. Jackson*, 390 F. App'x 130, 133 n.5 (3d Cir. 2010).

trafficking operation he was involved in appears to have been at least somewhat sophisticated. *See id.* at *1.

The Court has weighed these aggravating considerations against the facts in the record that do favor leniency, such as the information about Mr. Gray's childhood reflected in his PSR and the fact that his more culpable co-defendant received a much shorter sentence due to "safety valve" eligibility. But the Court is persuaded that all these factors were adequately considered by the sentencing court when it accepted the parties' bargained-for plea agreement and imposed a sentence well below the advisory guideline range.

To further reduce Mr. Gray's sentence by nearly half would give him more credit than those mitigating factors are worth. It would also create unwarranted disparities between Mr. Gray's sentence and the sentences routinely imposed on other, similarly situated defendants. Indeed, the remainder of Mr. Gray's sentence (about five years) would be towards the higher end of those commuted by district courts amid the pandemic, even though his underlying medical conditions and risk of exposure are, as discussed, not especially severe.[5]

---

[5] The Court does not mean to suggest that release is never appropriate when a defendant has substantial time remaining on his sentence or has already received a downward variance or departure relative to the guidelines. To the contrary, this Court has rejected such arguments. *See Somerville*, 2020 WL 2781585, at *12 ("[A]ll federal prisoners have committed serious crimes. If generalized (albeit legitimate) concerns about the dangers of guns and drugs were enough to bar to compassionate release, almost no one would be eligible."); *id.* at *16 ("If the Court grants Mr. Somerville's motion, he may be treated more favorably than some 'similarly situated' prisoners. On the other hand, if the Court denies Mr. Somerville's motion, he will just as likely be treated less favorably than many others. The principle of 'avoiding disparity' cuts both ways—not always in favor of a longer sentence.").

Here, however, it is the confluence of sentencing factors—substantial time remaining on a sentence below

Given these considerations, the Court finds that reducing Mr. Gray's sentence would be inconsistent with the nature of his offense and the kinds of sentences available under the guidelines, create unwarranted sentencing disparities relative to similarly situated defendants, and ultimately undermine the policy aims underlying his original sentence. Based on the evidence Mr. Gray has presented, so dramatic a departure from the ordinary sentencing regime is not warranted.

## **CONCLUSION**

For all the reasons discussed above, Mr. Gray's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) is denied.

An appropriate order follows.

DATED this 4th day of September, 2020.

> BY THE COURT:
>
> /s/ *J. Nicholas Ranjan*
> United States District Judge

---

the guideline range, a serious underlying crime, a criminal history that is not overstated, and the absence of mitigating factors not reflected in the original sentence—that persuades the Court that the section 3553(a) factors weigh against release. A strong showing of "extraordinary and compelling" reasons could overcome one, or even several, of these concerns. But the marginal showing Mr. Gray has made here cannot overcome them all.